[Civ. No. 167, 168. Fifth Dist. Mar. 21, 1963]

JOSEPH M. THOMAS et al., Plaintiffs and Respondents, v. O. C. L. WITTE et al., Defendants and Appellants.

(Two Cases.)

J. Richard Thomas for Defendants and Appellants.

Conron, Heard, James & Hamilton and Calvin H. Conron, Jr., for Plaintiffs and Respondents.

CONLEY, P. J.—The defendants appeal from two judgments in which the law and the facts are identical or parallel. Although an order of consolidation of the two suits was made in the trial court, separate findings and judgments were entered. Counsel for all parties stipulated that the cases be consolidated on appeal. There is a duplication of most of the parties plaintiff and defendant in the two suits, and the same basic factual elements appear in both; the decision of one necessarily controls the disposition of the other.

The essential question to be determined is whether or not, over the opposition of a coowner, there can be a partition of one oil lease of a unitized group of oil properties when they all are covered by an operating agreement presently in effect.

The complaint in each case is simple and to the point. In case 5 Civil No. 167 it is alleged that the plaintiffs, Joseph H. Thomas and H. Orville Housmann, and the defendant, O. C. L. Witte ". . . are the owners, as tenants in common, of the lessee's estates in certain Oil and Gas Leases covering the following parcels of real property situate, lying and being in the County of Kern, State of California: . . ."; then follow the metes and bounds descriptions of two parcels. The complaint continues by reciting that the interests of the plaintiffs and defendants in the property are in the following proportions: "Joseph M. Thomas, 80%, O. C. L. Witte, 14½%,

H. Orville Housmann, 5½.'' There are no encumbrances or liens of record, and no one other than the parties is interested in the property. The prayer asks for a partition, and if partition cannot be had without material damage to the rights of the parties, a sale of the property and a division of the proceeds.

The answer admits the basic allegations of the complaint but sets up four separate defenses; a fifth defense was later added by amendment. These special defenses refer to an operating agreement dated October 1, 1951, executed by all of the then owners covering leases on some 11 described parcels of real property. The first affirmative defense alleges that the operating agreement constitutes an implied waiver of the right of partition, and it is contended that if the partition were granted it would put an end to the operating agreement to the damage of defendant; the second separate defense pleads an express waiver by the operating agreement of the right to partition; the third defense is that the plaintiffs are estopped because of the existence of the operating agreement to maintain that they have any right to a partition; the fourth defense urges that to partition the properties in view of the operating agreement would be inequitable and would cause irreparable harm to the defendant; the fifth defense is that plaintiffs would only be entitled to a partial partition ''. . . when it is impracticable or highly inconvenient to make a complete partition of all the real property held in common'' under the operating agreement and that ''. . . all traditions and experiences of the oil industry indicate that the 3 wells in Section 26 and the remaining 27 wells in Section 23 and 26 should remain under single management and administration, and therefore it would be highly practicable and convenient to have a complete partition of all the properties . . . and conversely highly impracticable and highly inconvenient to have a partial partition as prayed for in Plaintiff's complaint. And defendant further alleges that it is not impracticable or highly inconvenient to make a complete partition of all the properties described in Exhibit A.''

The allegations in the complaint for partition in case No. 5 Civil 168 are parallel and equally simple. That pleading alleges that plaintiffs and defendants are the owners as tenants in common of the lessee's interest and estate in a United States Department of the Interior, Bureau of Land Management, oil and gas lease of lands under the act of February 25, 1920, as amended, said lease being Sacramento Serial No. 021031, bearing date January 1, 1956, and covering that parcel of real

property situate lying and being in the County of Kern, State of California, particularly described by metes and bounds.

The percentage of ownership in the lease is set forth as follows: Joseph M. Thomas, 80¾ per cent, O. C. L. Witte and Emily Alberta Witte, 12½ per cent, H. O. Housmann and Hertha B. Housmann, 6¼ per cent, Katherine M. Blair, ½ per cent. The pleading continues by reciting that there are no encumbrances or liens of record upon the property and that no person other than those mentioned is interested in the holding. The prayer is for a partition, and if the property cannot be partitioned in kind that a sale be held and the net receipts be divided in accordance with the interests of the parties. There are four affirmative defenses pleaded in the answer which correspond to the first four special defenses pleaded in the answer in case No. 5 Civil 167. An attempt was made to amend the answer by motion to include a fifth affirmative defense of the same character as that set forth in the earlier case, but the court denied the amendment even though a similar motion to amend was granted in the companion case. The error in the ruling is so obvious that counsel for respondents conceded in their brief that the fifth affirmative defense may be considered, for the purpose of the appeal, as having been pleaded. The operating agreement contains a description of some 14 leases.

The findings of fact in case No. 5 Civil 167 hold that the allegations of the complaint are true; that the operating agreement, a copy of which is attached to the answer as exhibit A was in fact entered into, but that the agreement does not raise an implied covenant against partition or waive the right to partition; that plaintiffs are not estopped to maintain the action and that it is not inequitable for them to sue. Strangely enough, there is no finding as to the allegations of the fifth affirmative defense. As conclusions of law, the court holds that plaintiffs are entitled to an interlocutory decree directing the appointment of three referees to examine and appraise the property and to report to the court as to the advisability of partitioning in kind or adopting such other equitable method of partition as may be meet and proper. The interlocutory judgment from which the appeal is taken names the three referees and directs that they report to the court with respect to the partition.

The findings of fact and conclusions of law and the judgment in case No. 5 Civil 168 are in all respects parallel to the findings and judgment in the earlier numbered case.

■ In 68 Corpus Juris Secundum, Partition, section 21, pages 33-34, it is said: "... the general rule is well settled that, where a case is fairly brought within the law authorizing a partition, either in a court of law or in a court of equity, the right of a cotenant to partition is absolute, according to the judicial decisions on the question, not a mere matter of grace within the discretion of the court, regardless of the motives of the parties entitled to partition, since the right is an incident of common ownership."

■■ *Asels* v. *Asels*, 43 Cal.App. 574, 578-579 [185 P. 419], has the following to say with respect to the general rule and waiver of the right to partition: "As to the legal effect and integrity of said agreement of October 20, 1916, little needs to be said. The right to partition was conferred upon either party by section 752 of the Code of Civil Procedure, but that this right may be waived is established by section 3513 of the Civil Code and by the decisions of the courts. The law upon the subject is summed up in Freeman on Cotenancy and Partition (second edition, section 442), as follows: 'We have spoken of the right of partition as an absolute right incident to every species of cotenancy, ... and as yielding to no consideration of hardship or inconvenience. In so speaking, we have had in view the law of cotenancy and partition as it exists independent of express or implied agreements between the respective parties in interest. There are cases from which it may be inferred that the right to partition cannot be waived, and that, to an application for partition, no other defense will be noticed by the courts than that the parties do not hold the property together undivided.' The learned author thereupon cites cases apparently so holding, but concludes as follows: 'But we think the decided preponderance of authority supports the proposition, that the general principle of law that the right to partition is absolute must be confined "in its application to ordinary joint tenancies or tenancies in common, where the right to partition is left to result as an ordinary legal incident of such tenancy, and that it was never intended to interfere with contracts between the tenants modifying or limiting this otherwise incidental right, nor to render it incompetent for parties to make such contracts, either at the time of the creation of the tenancy or afterward.'''"

Thus, partition, which is frequently denominated an absolute right (*De Roulet* v. *Mitchel,* 70 Cal.App.2d 120, 123, 124 [160 P.2d 574]), is subject to waiver, and also to estoppel and similar equitable defenses.

■■■ As is said in 4 Thompson on Real Property (1961 Replacement), section 1822, page 270: ''Partition cannot be had without the consent of all the parties where it would conflict with a previous agreement of the parties as to the use of the property.''

(See also *Hunt* v. *Meeker County Abstract & Loan Co.*, 128 Minn. 207 [150 N.W. 798, Ann.Cas. 1916D 925]; *McInteer* v. *Gillespie*, 31 Okla. 644 [122 P. 184, Ann.Cas. 1913E 400]; *Carolina Mineral Co.* v. *Young*, 220 N.C. 287 [17 S.E.2d 119; 151 A.L.R. 383]; *Elrod* v. *Foster* (Tex. Civ. App.) 37 S.W. 2d 339; 132 A.L.R. 670.)

■■■ Waiver of the right to partition may be effected by an implied as well as by an express agreement. (*Rowland* v. *Clark*, 91 Cal.App.2d 880, 882 [206 P.2d 59]; *Miranda* v. *Miranda*, 81 Cal.App.2d 61, 65 [183 P.2d 61].)

It is stated in 40 American Jurisprudence, Partition, section 7, page 7: ''Agreements which are implied, as well as those which are expressed, may operate to limit or modify the right to partition property held in co-ownership. An agreement to postpone partition may be implied where the purpose for which the property was acquired would be defeated by a partition.''

■■■ It is obvious that the correctness of the trial court's decision depends upon the meaning and effect of the operating agreements in the two cases. It should be noted that Charlotte A. Thomas, one of the parties to the original operating agreements, has since died and that her interest in the properties has passed to her son, Joseph M. Thomas. The present percentage of ownership of the various parties has been stipulated to, and it appears also that there can be no legitimate question that the parties to this suit continued to operate under the agreement after the death of Mrs. Thomas; it is contended by the appellant that the operating agreements have at all times been in full force and effect while a most unusual position is taken by the respondents as evidenced at the oral argument when counsel stated that he thought the operating agreements had legally terminated by reason of the death of Mrs. Thomas but that nevertheless everyone has been acting voluntarily as if they were still in full force and effect. We conclude that the operating agreements, not only by their terms but by the consistent course of action adopted and followed by all parties, are in fact in full force and effect at the present time.

■■■ In case No. 5 Civil 167 the agreement was made and entered into on the first day of October 1951, by Joseph M.

Thomas, called therein the operator, Charlotte A. Thomas, a widow, O. C. L. Witte and H. Orville Housmann, referred to as the nonoperators. The contract recites that the parties under date of October 1, 1951, acquired certain fee lands and oil and gas leases situated in sections 23 and 26, township 29 south, range 27 east MDBM in Kern County, described in detail in the instrument. The specific descriptions show some 11 parcels. A further recital is made that ". . . it is necessary for the proper operation and development of the aforesaid oil and gas leases to designate one of the parties to this agreement as Operator of the said properties for the benefit of all of the owners thereof; . . ." It is pointed out that the properties are producing oil and gas leases and that it is necessary to designate an operator to manage, direct and control all business pertaining to them. Joseph M. Thomas is named as operator ". . . with full power and authority to do and perform every act and thing whatsoever requisite and necessary to be done in the supervision, management, development, operation and maintenance of the aforesaid Unit land. . . ." The contract designates the oil and gas leases and properties as "joint lands" and provides that "Said joint lands are hereby made subject to this agreement and as between the parties hereto shall be operated by Operator as one unit and shall constitute a single, participating area, and as between the parties hereto of all oil, gas, and other hydrocarbons in, under, or recoverable from said joint lands are hereby unitized under the terms of this agreement; and that said joint lands shall be subject to any land-owners royalties, overriding royalties and participating royalties that may be effective as to said Unit lands." The agreement refers to a joint account to be maintained by the operator for the purpose of recording all joint expenses, revenues, income and other transactions pertaining to the joint lands and the operation thereof. All actual costs of drilling, developing, equipping, maintaining, and operating the wells on said land shall be paid out of the joint funds and in accordance with the share of the parties in the operation, namely, Joseph M. Thomas, 40 per cent, Charlotte A. Thomas, 40 per cent, O.C.L. Witte, 14½ per cent, H. Orville Housemann, 5½ per cent. The operator is given detailed authorization to operate the leases and to carry on the business for all of the parties. The retaining fund referred to in the contract is to consist of the sum of $25,000, and it is provided: "No party to this agreement shall sell, transfer, convey, quitclaim, or surrender any of their interest in and to the leases or lands subject to this agreement without the written consent

of the other parties, and in the event either party desires to sell their interests in this agreement or the lands or leasehold covered thereby, or any portion thereof, said party hereby agrees to give the first refusal to the other parties to purchase the same upon the same terms and conditions as they may have a bona fide offer therefor from a third person. In the event any party receives a bona fide offer to purchase all or any part of his interest in this agreement or the lands or leasehold covered thereby and said party desires to accept said bona fide offer, said party shall give each of the other parties hereto ten (10) days written notice of said offer setting forth the complete terms and conditions thereof and the other parties for such ten (10) day period, shall have the right, ratably or individually, to meet such offer and to purchase such interest of said party upon the same terms and conditions as are set forth in such offer. In the event the other parties do not notify the party desiring to sell of their intention to accept said offer to sell in writing within said ten (10) day period, said party may be free to sell said interest to the party making the original bona fide offer to purchase.''

The operating agreement specifically states that it is not the intention of the parties to create a partnership or to render themselves liable as partners. Furthermore, it is said, ''This agreement shall run with the joint lands until terminated.''

It seems perfectly clear that this document is a tightly designed contract among all of the parties having an interest in the leases to work them together cooperatively in connection with their common ownership.

The operating agreement in action 5 Civil No. 168 is in legal effect identical in basic provisions with the contract already examined. It was executed on the 25th day of October 1950, and the original parties were Joseph M. Thomas, referred to as operator, and Charlotte A. Thomas, a widow, A. J. West and Mabel C. West, husband and wife, O. C. L. Witte and Emily Alberta Witte, husband and wife, H. Orville Housmann and Hertha B. Housmann, husband and wife, as nonoperators. It refers to the ownership in common of 14 specifically described oil properties and provides for the same type of operating arrangement as in the companion case. It differs somewhat in detail from the earlier instrument, however, by expressly providing that the operating capital for use by the operator in the maintenance, management and control of the joint lands is the sum of $25,000 ratably contributed at the start by the parties in accordance with their percentage of own-

ership, and maintained by allocating sufficient funds from the sale of oil and gas and by advances to be made ratably by the parties. The term of the contract is 20 years or so long as oil and gas or other hydrocarbon substances are produced in commercial quantities. The operator has the same wide powers and discretions as in the companion contract. The operator is given an option of withdrawing as such, upon giving a 30-day notice, but in such circumstances the coowners may name another operator to carry on the common business:

"In the event, however, Operator should desire to terminate this agreement, Operator shall give Non-Operators thirty (30) days written notice prior to the date of termination within which Non-Operators may determine the future operation of the joint lands. Non-Operators shall within said period select a successor to Operator or enter into such other agreement as may be necessary for the operation of said joint lands and upon expiration of said thirty (30) day period, all obligations and responsibilities of Operator shall cease and terminate."

In each case, therefore, there is an all-inclusive contract entered into by the coowners for the operation as a unit of numerous oil properties; the provisions are inextricably integrated, and it seems clear that the solemn writing in each case necessarily includes an implied waiver of any right to partition while the operating agreement remains in effect.

In 68 Corpus Juris Secundum, Partition, section 44, pages 66-67, it is said: "The general rule is well settled that partition will not be granted at the suit of one in violation of his own agreement, since the agreement operates as an estoppel against the right to partition. . . . The agreement not to partition may be implied as well as express; and will be readily implied and enforced if such implication proves necessary to secure a fulfillment of an agreement between the cotenants, or if the granting of partition would destroy the estate sought to be partitioned."

As stated in *Rowland* v. *Clark, supra,* 91 Cal.App. 2d 880, 882: ". . . the right to partition property is not always absolute and may be defeated by reason of an agreement between the cotenants, permitting a variance from the ordinary incidents of such cotenancy."

Apposite authority for the specific situation here involved is furnished by cases from other states, particularly Texas. In *Elrod* v. *Foster, supra* (Tex. Civ. App.) 37 S.W.2d 339, 342, the court says: "The trial court correctly denied

appellant a partition of his mineral estate in the 60 acres of land, because a partition of the same, either in kind or by sale and division of the proceeds, would have worked a cancellation of the oil and gas lease contract, thereby depriving all parties to it of their respective rights in the premises. We think the proposition needs no extended discussion that a part owner of a mineral estate in land, who has contracted with others having interests to pay his proportionate part of expenses of drilling and developing the premises for oil and gas, cannot demand a partition of the mineral estate so as to work a cancellation of the drilling contract, and thereby relieve himself of his proportionate part of the expenses of developing the lease.''

Appellants also rely on *Odstrcil* v. *McGlaun* (Tex. Civ. App.) 230 S.W.2d 353 at pages 354-355: ''Although it is often said that the right to partition is absolute it was never intended to interfere with contracts that expressly or impliedly denied or limited that right. 40 Am.Jur.5; 132 A.L.R. 667 et seq. To now compel a partition of the minerals owned jointly by the McGlauns and Birdwell would be to abrogate the contract between them and deprive Birdwell of his right under that contract to lease both his own and McGlaun's interest in the minerals. By said contract McGlaun impliedly agreed not to partition and he is now estopped to assert such a right.'' (See also *Warner* v. *Winn* (Tex. Civ. App.) 191 S.W.2d 747; *Lane* v. *Hughes* (Tex. Civ. App.) 228 S.W.2d 986, 989; *Allison* v. *Smith* (Tex. Civ. App.) 278 S.W2.d 940, 945-946; *Davis* v. *Davis* (Tex. Civ. App.) 44 S.W.2d 447, 450.)

We thus conclude that there was an implied waiver of the right of partition on the part of the plaintiffs while the operating agreements are effective and that partition was therefore improperly granted by the trial court.

 Appellants' contention that even if partition were permissible it should include all of the leases described in each of the contracts rather than a single one also seems to us to be well founded. In each of the operating agreements there was a unitization of all of the described leases owned by the parties, and it was provided that they should be operated together with the rights and duties of the parties inextricably interwoven so that the whole was to be treated as the basic property of the parties. In 4 Thompson on Real Property (1961 Replacement), section 1823, at page 280, it is said:

''As a general rule, partition will not be made of a part only

of an entire estate. The result of entertaining a suit for partition in such case would be the splitting up of a cause of action in its nature entire and indivisible. Where several parcels of land are owned by the same parties as tenants in common and one of the tenants seeks to partition a part of the land only, leaving the rest undivided, another tenant by counterclaim can bring the remaining lands into the suit for partition."

Appellants cite *Sutter* v. *City & County of San Francisco,* 36 Cal. 112, 116, in support. In that action the plaintiff sought to partition only a small portion of the property held in common with the defendant; defendant demurred on the ground that the complaint did not state facts sufficient to constitute a cause of action in that the tenancy in common covered a much larger tract than the parcel which was sought to be partitioned; the court sustained the demurrer and plaintiff declined to amend; judgment was rendered for defendant; the Supreme Court in affirming the judgment said:

"[T]he Court, upon a full showing, is to determine the question, whether it is 'impracticable and highly inconvenient to make a complete partition in the first instance among all the parties interested,' and no such question was presented for the opinion of the Court, or determined.

"The complaint shows no right to have the particular piece partitioned. Plaintiff's interest, *as alleged,* is in the entire tract, and not in that which remains unsold. The sale by defendant of portions of the tract could not pass *his* interest. He, as tenant in common, still has an undivided interest in the entire tract, and, if a partition is to be made, it must be made as to the whole. It would be necessary to consider the whole in making a partition, in order to determine the relative value of different parts. Different portions might be of greatly unequal value, and a tenant, who has an interest equal to the ratio of one hundred varas to the whole, would not be entitled to have the most valuable one hundred varas in the tract set off to him. The rights of the parties cannot be ultimately and finally determined without an examination and settlement of the rights of the parties as to the whole tract, and, to do this it would be necessary to make the grantees of the defendant parties."

Appellants correctly point out that the early statutes were basically identical in form with sections 752 and 760 of the Code of Civil Procedure, and correctly maintain that the *Sutter* case is controlling on this question. In 37 Califor-

nia Jurisprudence 2d, Partition, section 18, page 437, it is said:

"Generally, partition should be made of the entire tract held in common, and one tenant may not obtain partition of a part only of the common property and have his entire interest located in that part. But a statute provides that whenever it is impracticable or highly inconvenient to make a complete partition in the first instance, among all parties in interest, the court may first ascertain the shares or interests respectively held by the original cotenants and cause a partition to be made as if the original cotenants were the sole parties in interest, and thereafter may proceed in like manner to partition separately each portion so ascertained. . . ."

 Appellants further contend that the court has to find from the evidence that it is highly inconvenient or impracticable to make a complete partition of the whole property in order to warrant partition of only a part of the total. We have already noted that in case No. 167 this very question was specifically placed in issue by the fifth separate defense in the answer and that the court improperly failed to make a finding on the question. The expert witness Dana, a geologist, was asked whether it would be economically feasible to operate the three wells specified in 5 Civil No. 167 separately from the remainder of the wells. He answered that it would involve the setting up of a whole new management and operating unit to handle the three small wells, including provision for decision making, executive work, bookkeeping, tax calculation and accounting; he said that it would not be economically feasible to operate these wells as an operating unit. Mr. Dana testified to the same expert conclusions concerning the two wells as to which plaintiffs seek partition in case No. 5 Civil 168.

The properties in each case are being operated as a unit pursuant to agreement; it is clear from the evidence this is more efficient and economical for all parties than any other arrangement and that an attempt to operate each lease separately would be impractical and perhaps not even feasible. If each lease should be sold with its two or three oil wells which cannot be operated separately the marketability of the defendants' total interest in the common properties would be greatly lessened or perhaps completely destroyed.

It is our conclusion, therefore, that even when otherwise justified, the partition of less than all of unitized oil properties should not be granted over the opposition of one or more of the owners in common in the absence of a finding that the

partition of the whole is highly inconvenient or impracticable. For the reasons specified, the judgments are reversed.

Brown (R. M.), J., and Stone, J., concurred.

A petition for a rehearing was denied April 17, 1963, and respondents' petition for a hearing by the Supreme Court was denied May 14, 1963.